UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00108-GNS-HBB

ANNTONIA WITHERS                                               PLAINTIFF

v.

UNITED OF OMAHA
LIFE INSURANCE COMPANY                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Judgment (DN 13).   The matter is ripe for adjudication.   For the reasons below, Plaintiff's motion is **GRANTED**.

### I.        SUMMARY OF THE FACTS

This action arises from short-term disability ("STD") and long-term disability ("LTD") claims filed by Plaintiff Anntonia Withers ("Withers"), which were denied by plan administrator Defendant United of Omaha Life Insurance Company ("Omaha").   Withers was employed by The Adanta Group ("Adanta"), as the Director of Supported Employment Program at The Adanta Group Behavior Health Services, and Adanta provided an STD and LTD benefits plan to its employees administered by Omaha.   (Compl. ¶¶ 6-8, 26-27, DN 1-2).   As such, Omaha is responsible for payment of any disability benefits under the policies.   (Compl. ¶¶ 11, 30).

Withers claims she became disabled during her employment, was unable to return to work at Adanta, and remains disabled as defined by the STD and LTD plans.   (Compl. ¶¶ 12, 31).

1

Withers filed claims for both STD and LTD benefits, but her STD claim was partially denied[1] and her LTD claim was fully denied.   (Compl. ¶¶ 13-15, 32-33).   These denials were appealed, but Omaha's denial was upheld.   (Compl. ¶¶ 16-17, 34-35).   As a result of these decisions, Withers has exhausted her administrative remedies.   (Compl. ¶¶ 18, 36).

On July 30, 2019, Withers filed her Complaint in the Russell (Kentucky) Circuit Court. Subsequently, on August 28, 2019, Omaha removed the action to this Court.   (Notice Removal DN 1).   The matter having been briefed by the parties is ripe for decision.

## II.    JURISDICTION

The Court has subject matter jurisdiction in this case pursuant to 29 U.S.C. § 1132(e), as this Court has concurrent jurisdiction to the state courts regarding claims filed under 29 U.S.C. § 1132(a)(1)(B).   The Court also has subject matter jurisdiction due to 28 U.S.C. § 1331, because the claims herein are subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.   This case was properly removed from the Russell (Kentucky) Circuit Court to this Court pursuant to 28 U.S.C. § 1441.   (Notice Removal DN 1).   Finally, the parties agree that any state law breach of contract claims are preempted by 29 U.S.C. § 1144.   (Joint Report 2, DN 8).

## III.    STANDARD OF REVIEW

During the parties' Fed. R. Civ. P. 26(f) meeting on October 11, 2019, they "agree[d] that the Court must employ the *de novo* standard in reviewing the Defendant's denial of this benefit

---

[1] Plaintiff's STD claim was approved for the period from January 11, 2018, to May 7, 2018. (Admin. R. 000403, DN 10).   After Defendant's review of the documentation, its consultant "concluded that restrictions or limitations to preclude work activities are not supported from May 8, 2018, and ongoing."   (Admin. R. 000250).

2

claim." (Joint Report 2); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan . . . ."). "When *de novo* review is compelled, no form of [] deference is acceptable." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991). Further, "[w]hen applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits 'is to determine whether the administrator . . . made a correct decision'. The administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002) (internal citation omitted) (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966-67 (6th Cir. 1990)).

As for the evidence the Court may consider, the parties also "agree[d] that the Court is limited to the evidence before the Defendant at the time of making the claims determination, with the exception of any discovery permitted [by the Rule 26(f) meeting]." (Joint Report 2); *see also Perry*, 900 F.2d at 966 ("Thus, *Bruch* does not require district courts to hear and consider evidence not presented to the plan administrator in connection with a claim. This view is consistent with the proper judicial role in ERISA cases and precedent."). "To succeed in [her] claim for disability benefits under ERISA, Plaintiff must prove by a preponderance of the evidence that [she] was 'disabled,' as that term is defined in the Plan." *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 700-01 (6th Cir. 2014) (citing *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 F. App'x 511, 516 n.4 (6th Cir. 2006); *Rose v. Hartford Fin. Servs. Grp.*, 268 F. App'x 444, 452 (6th Cir. 2008)). As the Sixth Circuit has explained:

> Courts should not be mere rubber stamps that uphold an administrator's decision whenever the plan was able to find a single piece of evidence—no matter how

3

obscure or untrustworthy—to support a denial of a claim for ERISA benefits. Further, courts should not uphold a termination when there is an absence of reasoning in the record to support it.

*Neaton v. Hartford Life & Accident Ins. Co.*, 517 F. App'x 475, 481 n.10 (6th Cir. 2013) (internal

citation omitted) (citing *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

## IV.   DISCUSSION

### A.    Parties' Arguments

Withers' primary argument is that she has satisfied the definitions of disability as provided by the plans.   (Pl.'s Mem. Supp. Mot. J. 16, DN 13-1) [hereinafter Pl.'s Mem.].   Withers claims her occupation as the Director of Supported Employment Program at The Adanta Group requires a high level of cognitive functioning, specifically providing oversight to the Individualized Placement and Supports for supported employment programs; training and supervising, and field mentoring staff; monitoring outcomes; implementing quality improvement plans; and acting as a liaison to other departments and agencies.   (Admin. R. 000480-83, DN 10).   This interaction requires effective written and verbal communication, functioning with team members, the ability to work independently, adapting to new and changing situations, planning skills for effectiveness and efficiency, responding to emergencies, and safety compliance.   Withers asserts that Omaha's denial neglected to mention a letter from Withers' employer, detailing Withers' inability to perform her essential job duties, and that the reviewing physicians—Drs. Wayne Gordon ("Dr. Gordon") and Joseph Jares III ("Dr. Jares")—did not sufficiently account for Withers' position when coming to their conclusions.   (Admin. R. 000479; Pl.'s Mem. 18).

Withers also asserts that her voluminous documentation of all her medical visits, diagnoses, and examination results, especially the notations by Dr. Amir Zia ("Dr. Zia") and Dr. James Owen

("Dr. Owen"), demonstrates a clear showing that disability benefits should have been awarded. (Pl.'s Mem. 18-20).   Further, Withers claims that the non-examining file reviews by Drs. Gordon and Jares are inadequate and unreliable.   (Pl.'s Mem. 20).   According to Withers, Dr. Gordon dismissed documentation and concerns by Withers' treating physician regarding her symptomology.   Dr. Gordon concluded that "an impairing neurologic diagnosis ha[d] not been established[,]" as a result of his inability to speak to Withers' treating neurologist, Dr. Zia. (Admin. R. 000254).   Dr. Jares was not provided all the relevant records initially but after a more thorough review, "conceded that there were legitimate findings related to Withers' conditions and recommended additional treatment."   (Pl.'s Mem. 20-22).

Withers contends that Dr. Jares' review, as well as the objective diagnostic findings, show that disability benefits should be approved.   Withers further critiques Omaha's denial of benefits because it never sought to have another review or examination done, nor did Omaha explain why it was not considering Withers' treating source opinions.   (Pl.'s Mem. 22-23 ("While treating doctors' findings are not given deferential weight, United must give them due consideration and have good reasons to reject their opinions."   (citing *Mokbel-Aljahmi v. United of Omaha Life Ins. Co.*, No. 15-12537, 2016 U.S. Dist. LEXIS 135100, at *17 (E.D. Mich. Sept. 30, 2016))).

In contrast, Omaha focuses on Withers' claim documentation and asserts that there was no showing of any medical connection between her symptoms and illness, or that the illness impacted her ability to work.   (Def.'s Resp. Pl.'s Mot. J. 10, 13, DN 14 [hereinafter Def.'s Resp.].)   Omaha asserts that Withers' attending physician, Dr. John Kilgallin ("Dr. Kilgallin"), was asked to detail any functional limitations related to Withers' work in the STD benefits claim, but wrote, "[t]his is a functional capacity evaluation which we do not perform (physical therapy normally [does]

5

this)[.]   An[n]tonia's job does not require her to be physically challenged.   She uses her brain primarily."   (Admin. R. 000485 (capitalizations changed)).   When Dr. Zia was asked to indicate Withers' mental functional limitations, he checked the "markedly limited" selection for each item on the form, only wrote "decreased motor activity" for functions that Withers would be unable to perform, and wrote only "cognitive decline" under the functional restrictions section.   (Admin. R. 000486).   Omaha claims that the "markedly limited" responses were not supported by medical evidence.   (Def.'s Resp. 11).   In fact, Omaha contends that Withers' tests were "largely normal." (Def.'s Resp. 11; Admin. R. 000053-59).

When looking at Withers' LTD claim, Omaha points to Section 5 of the claim form pertaining to the Physician's Statement.   The subsection entitled "Information about the patient's inability to work" is crossed out, and Dr. Zia noted that Withers cannot work when having a migraine and "can work [with] intermittent time off for migraines."   (Admin. R. 001192). Omaha claims this statement "negated any diagnosis of long-term disability[,]" as the migraines were intermittent, which "did not affect [Withers'] ability for part-time or full-time work." (Def.'s Resp. 14).   Relying on this statement, allegedly normal test results, and the file review by Dr. Gordon, Omaha denied the LTD benefits claim.   (Def.'s Resp. 15).

Finally, Omaha contends that the letter from Adanta's Human Resources department was properly deemed of little relevance.   (Def.'s Resp. 19-20).   The letter from Adanta stated that "we have determined that [Withers'] condition is such that she cannot interact with her employees and clients at a capacity which we feel is safe for her and those employees and clients."   (Admin. R. 000479).   Omaha argues that Adanta's determination that Withers was unable to perform her duties was a subjective observation, not based on Withers' objective ability to perform her regular

6

position.   (Def.'s Resp. 20).   Omaha states that this form of letter could only be relevant "if it identified specific, *objective* failures by an employee due to a medical condition."   (Def.'s Resp. 20 (emphasis added)).

In her reply, Withers contends that Omaha "cannot add an 'objective evidence' requirement to its insurance policy."   (Pl.'s Reply Mot. J. 2, DN 15).   Withers emphasizes that her "employer is in the best position to determine whether one of its own employees can perform the duties required in the specific occupation, including as it is performed in the national economy."   (Pl.'s Reply Mot. J. 2).   Finally, Withers claims that she does present substantial objective medical documentation, which is sufficient for approving her STD and LTD claims consistent with Adanta's letter.

### B.   Review of the Medical Documentation

The administrative record in this case contains reports, examinations, test results, and reviews from December 2017 to approximately early 2019.

On December 19, 2017, Dr. Kilgallin met with Withers on a follow-up regarding "metabolic syndrome."   (Admin. R. 001094).   Dr. Kilgallin noted a medical history of hyperlipidemia, hypertension, hypothyroidism, Meniere's disease, and Hashimoto's disease, in addition to gallbladder and sleep apnea surgery.   (Admin. R. 001095).   Withers also complained of excessive sweating, but examination of Withers was normal at that time.   (Admin. R. 001096).

On February 21, 2018, Withers had an x-ray of her cervical spine, and radiologist Dr. Abdelrahma Abdalla ("Dr. Abdalla") found "[m]inimal reversal of the normal cervical lordosis and minimal narrowing of the disc space at C4-5."   (Admin. R. 000064).   Withers also had an x-ray of her lumbar spine, which Dr. Abdalla found was "[u]nremarkable".   (Admin. R. 000065).

Finally, Dr. Zia completed a report indicating Withers had syncope and collapse, in addition to "[l]ikely underlying POTS/autonomic dysfunction . . . ."   (Admin. R. 000205).

On February 28, 2018, Withers had an MRI of her brain, which found that Withers' "[c]erebellar tonsils are low-lying through the foreman magnum by 3mm."   (Admin. R. 000167). This makes the tonsils "[s]lightly low-lying" but the MRI was "otherwise unremarkable . . . ." (Admin. R. 000167).   There was no evidence of intra-axial or extra-axial masses, hemorrhages, infarctions, midline shifts, or brain herniations; there was no evidence of abnormal signals; and the visualized parts of the orbits and paranasal sinuses were intact.   (Admin. R. 000167).   On the same day, Dr. Zia evaluated Withers for postural orthostatic tachycardia syndrome ("POTS"), and the tilt table test yielded a borderline abnormal result.   (Admin. R. 001016, 700).   Dr. Zia opined that "[t]here was no evidence of orthostatic hypotension, neurally mediated syncope or an exaggerated postural tachycardia (POTS)."   (Admin. R. 000796).   The tilt table test results were sent to the Mayo Clinic, which determined the results were normal.   (Admin. R. 000700). Corresponding documentation from that visit noted an assessment of syncope and collapse, which was "[l]ikely underlying POTS/autonomic dysfunction . . . ."   (Admin. R. 000200).

On March 5, 2018, Dr. Zia discussed several issues with Withers, including autonomic dysfunction and Withers' EEG and MRI results.   (Admin. R. 000199).   From the physical evaluation, Dr. Zia noted that Withers' knee reflexes were hyperreflexic and Withers complained of several falls; however, Dr. Zia explicitly noted that Withers showed no tremors and was negative for bradykinesia though noted her history of claimed tremors.   (Admin. R. 000199). Additionally, this visit was the first documented report that Withers noted visual phenomena and

blurred vision during her headaches, which could become full visual hallucinations at night. (Admin. R. 000199, 831).

On March 9, 2018, Withers visited Dr. Zia again.   (Admin. R. 000195).   Dr. Zia observed a positive right hand tremor between 4-6 hertz and a positive head tremor.   (Admin. R. 000195). Additionally, knee reflexes were hyperreflexic, and bradykinesia was present.   (Admin. R. 000195).   Reviewing these complaints and results, Dr. Zia found unspecified tremors, generalized hyperhidrosis, chronic headaches, and other secondary parkinsonism without a clear diagnosis at the time.   (Admin. R. 000195).

On March 22, 2018, Withers returned to Dr. Kilgallin for a follow-up on her metabolic syndrome and complaints of excessive sweating (hyperhidrosis).   (Admin. R. 001098).   Withers' physical evaluation was normal, and there was no mention of tremors.   (Admin. R. 001098-99). Dr. Kilgallin noted diagnoses of metabolic syndrome and Arnold-Chiari syndrome without spina bifida or hydrocephalus.   (Admin. R. 001099).

On March 23, 2018, and again on April 6, 2018, Withers followed-up with Dr. Zia. (Admin R. 000190-91, 000835-36).   Withers' physical examination was largely normal, but her knee reflexes were hyperreflexic, she had a positive tremor in her right hand at 4-6 hertz, she had a head tremor and demonstrated bradykinesia.   (Admin. R. 000191, 000836).   The assessment noted the same conditions as Withers' prior visit:   unspecified tremors, generalized hyperhidrosis, chronic headaches, and other secondary parkinsonism without a clear diagnosis.   (Admin. R. 000191, 000836).

On April 12, 2018, Withers met with Sarah Godbey, PA-C ("Godbey"), to get a second opinion regarding a diagnosis of Arnold Chiari syndrome without hydrocephalus.   (Admin. R.

001086).   Withers conveyed that she had been diagnosed with Parkinson's disease due to her tremors, and her medication has not been helping.   (Admin. R. 001086).   Godbey remarked that Withers was neurologically intact but noted "[s]ome tremoring in the hands when reaching." (Admin. R. 001086).   Ultimately, Godbey completed the assessment and reaffirmed the finding of Arnold-Chiari malformation and bad headaches.   (Admin. R. 001086).   Godbey noted that the "low lying cerebellar tonsils [are] indicative or Chiari I malformation."   (Admin. R. 001086).

On April 16, 2018, Withers had x-rays taken of her thoracic spine and cervical spine. (Admin. R. 000761, 797).   The C2-3 through C7-T1 showed no disc herniation, central spinal stenosis, or neural foraminal impingement.   (Admin. R. 000761).   A slight right paracentral disc bulging was noted at C4-5; C5-6 had minimal broad-based disc bulging; there was a left paracentral disc bulge at C6-7 as well as a dilated nerve root sheath on the right side.   (Admin. R. 000761).   A 0.7 cm diameter hypodense nodule was noted in the left lobe of Withers' thyroid gland.   (Admin. R. 000762).   Additionally, there was evidence for "muscle spasm without acute fracture dislocation[.]"   (Admin. R. 000762).   Withers' thoracic spine appeared largely normal. (Admin. R. 000797).

On April 19, 2018, Withers' file was referred to Nurse Janice Harrison ("Harrison") for a records review in relation to Withers' STD claim.   (Admin. R. 001344-50).   Harrison noted the diagnosis of secondary Parkinson's tremors, but was "not clear what [] etiology [the tremors] might be."   (Admin. R. 001347).   Harrison noted in comparing Withers' STD claim to her first visit to Dr. Zia:

> It is a bit perplexing because the Neurologist goes from documenting a completely normal neurological exam 02/21/18 to documenting "tremor positive right hand 4-5 Hertz worse than left; positive head tremor present.   Bradykinesia positive (slowness of movement and is one of the cardinal manifestations of Parkinson's

> disease).   Arm swing decreased on the left. Gait normal.   Dysmetria negative."
> just 3 weeks later.   And again there is no documentation from any Provider on or
> around her LDW of 01/03/18 to corroborate a need for [] [Withers] to be precluded
> from her regular activities.

(Admin. R. 001347).   Harrison stated that "[t]here is nothing noted in the exam that would

preclude [] [Withers] from her regular duties . . . ."   (Admin. R. 001348).   Finally, Harrison noted

that Dr. Kilgallin's response in Withers' STD claim "implies that there may not be any significant

physical deficits but none of the records indicate any cognitive deficits either."   (Admin. R.

001348).

On April 27 and May 3, 2018, Withers returned to Dr. Zia.   (Admin. R. 000299-300, 831-

32).   Like many prior visits, Withers reiterated her claims of fatigue, weakness, daily headaches

(including nausea, vomiting, visual phenomena, blurred vision, and visual hallucinations),

depression, dizziness, and lightheadedness.   (Admin. R. 000299, 831).   Consistent with her prior

visits, Withers exhibited knee reflexes hyperreflexic, positive tremor in the right hand at 4-6 hertz,

positive head tremor, bradykinesia, and her arm swing was decreased on her left side (another sign

of Parkinson's disease).   (Admin. R. 000300, 832).   Ultimately, Withers' assessment was other

secondary parkinsonism ("[Parkinson's] disease versus multiple system atrophy.   It does not look

like progressive supranuclear palsy at present, likely [Parkinson's] disease"), unspecified tremor,

cervical disc degeneration at C5-C6 level, and chronic headaches.   (Admin. R. 000300, 832).

On May 7, 2018, Withers met with Nurse Molly Hutchison ("Hutchison") for a follow-up

for her Arnold-Chiari malformation.   (Admin. R. 000213).   Hutchison noted that Withers had

been evaluated several times for abdominal and chest pain without significant findings.   (Admin.

R. 000213).   Further, Hutchison stated that Withers complained of intermittent blurred and double

vision, but an exam by Withers' optometrist was unremarkable.   (Admin. R. 000213).   During

11

the neurological portion of the examination, Hutchison found no motor atrophy, weakness, or tremors, and motor functions were symmetrical.  (Admin. R. 000213).   Hutchison opined the following:

> Notes:   MRI of the cervical spine shows a whiplash injury with straight spine noted and loss of normal cervical lordotic curve.   No other significant abnormality is noted.   MRI of the thoracic spine is within normal limits for the patient's age, MRI of the brain shows very slight downward position of the cerebral tonsils otherwise MRI of the brain is normal.   Dr. Elnaggar [sic] reviewed the patient's scans as well. He agrees with the treatment plan.

(Admin. R. 000214).

On May 17 and June 13, 2018, Withers returned to Dr. Zia reporting similar complaints as previous visits.  (Admin. R. 000292, 826-27).   During the examination, Withers' knee reflexes were hyperreflexic, there was a positive tremor in her right hand at 4-6 hertz, a positive head tremor was present as well as bradykinesia, and Withers' arm swing was decreased on the left side. (Admin. R. 000293, 827).   The assessment reiterated similar assessments of unspecified tremor, other cervical disc degeneration at C5-C6, chronic headaches, and other disorders of the autonomic nervous system.   (Admin. R. 000293, 827).

On June 20, 2018, Withers visited Dr. Harold Rutledge ("Dr. Rutledge") at Lake Cumberland Regional Hospital for a right C2 ganglion injection.  (Admin. R. 001082).   This injection was to act as a nerve block, in order to reduce the headache pain.   After reviewing Withers' medical history, Dr. Rutledge commented that Withers' history "started rather insidiously, but progressed rapidly in the last year" and the progression has created "an unusual pain condition and symptomology . . . ."   (Admin. R. 001082).   Dr. Rutledge also noted Dr. Amir El-Naggar ("El-Naggar") did not believe that Withers' "symptomologies were necessarily arising

12

from the Arnold-Chiari malformation." (Admin. R. 001082). After the injection, Withers reported in the recovery room a 60% reduction in pain. (Admin. R. 001083).

On July 19, 2018, Withers was seen again by Dr. Zia, with findings consistent with previous visits. (Admin. R. 000289-90). Withers' knee reflexes were still hyperreflexic, with a positive tremor in her hand and head, bradykinesia, and her left arm swing was still decreased. (Admin. R. 000290). There was a change from the prior visit, however: Withers' gait was now abnormal. (Admin. R. 000290). Withers' first step was decreased. (Admin. R. 000290). Even then, the assessment noted the same five conditions: unspecified tremors, other cervical disc degeneration at C5-C6 level, chronic headaches, other disorders of autonomic nervous system, and other secondary parkinsonism. (Admin. R. 000290).

On July 23, 2018, Withers returned to Dr. Kilgallin for the first time since March 22, 2018, following up for metabolic syndrome and hyperhidrosis. (Admin. R. 001100-02). Dr. Kilgallin's examination of Withers was largely unremarkable, but he did mark some "neuropathy". (Admin. R. 001102). Dr. Kilgallin detailed three diagnoses: essential (primary) hypertension, metabolic syndrome, and gastro-esophageal reflux disease with esophagitis motor neuropathy. (Admin. R. 001102).

Dr. Zia wrote a letter regarding Withers on September 7, 2018, indicating that he had been treating Withers since February 21, 2018, and had diagnosed Withers with Parkinson's Disease on August 23, 2018. (Admin. R. 001120). There were no explanations or further discussions in this letter.

On September 25, 2018, Withers saw Dr. Rutledge for another ganglion injection. (Admin. R. 001084). Withers reported that "[f]or 3 to 4 weeks, [the injection] almost completely

13

relieved the headache syndrome she has suffered from for many months."  (Admin. R. 001084).

Dr. El-Naggar recommended another injection as pain had resumed.  (Admin. R. 001084).  No

details were provided about how Withers rated her pain following the injections, only that "she

did very well."  (Admin. R. 001085).

On September 26, 2018, Withers followed-up with Dr. Kilgallin, who commented that

Withers raised no new complaints.  (Admin. R. 001117-19).  Dr. Kilgallin did note, however,

that Withers reported dropping objects.  (Admin. R. 001118).  Withers' examination was largely

normal, and the sole diagnosis was for metabolic syndrome.  (Admin. R. 001119).

The first visit documented in the record by Withers with Dr. El-Naggar was on October 4,

2018.  (Admin. R. 001090-91).  Dr. El-Naggar reiterated the same medical history as Nurse

Hutchison and noted that Withers' second ganglion injection did not help her.  (Admin. R.

001090).  The examination was normal, and no tremors were found.  (Admin. R. 001090).  Dr.

El-Naggar opined that Withers' cervical MRI does not show an Arnold-Chiari malformation,

because "[t]he cerebellum stays above the foramen magnum."  (Admin. R. 001091).  Dr. El-

Naggar mentioned Withers' degenerative disc disease and recommended a cervical spinal cord

stimulator trial.  (Admin. R. 001091).

On October 12, 2018, Withers returned to Dr. Zia for a left ulnar nerve block.  (Admin. R.

001012).  Withers reported falling into a corner several days prior to the visit after being dizzy.

(Admin. R. 001012).  Dr. Zia listed Withers' active problems and conditions:  syncope and

collapse, chronic pain, headache, abnormal brain scan, secondary parkinsonism, unspecified

tremor, generalized hyperhidrosis, cervical disc degeneration at C5-C6 level, disorders of

autonomic nervous system, Parkinson's disease, and other disturbances of skin sensation.

(Admin. R. 001013).   Withers' physical exam was almost identical to her previous visit with Dr. Zia:   Withers' knee reflexes were hyperreflexic, she had positive tremors in her head and hand, she exhibited bradykinesia, and her arm swing was decreased on the left side.   (Admin. R. 001013).

On January 17, 2019, Withers saw Jacob Colley, APRN ("Colley").   (Admin. R. 000959-60).   Colley did not find any tremors and noted that Withers was able to complete the finger to nose and heel to shin movement exams.   (Admin. R. 000959).   Colley further mentioned that Withers could ambulate without assistance and opined that Withers may have degenerative cervical disc, discogenic cervical pain, bilateral occipital neuralgia, and a sprain of the ligament in the cervical spine region.   (Admin. R. 000959).

On January 28, 2019, Withers visited Russell County Rural Health Clinic to establish care where Dr. Liesel Grentz ("Dr. Grentz") noted Withers' medical history, including autonomic dysfunction disorder, chronic angina, degenerative disc disease, Parkinson's disease, gastroparesis, hypertension, dyslipidemia, diabetes mellitus, Hashimoto's thyroiditis, gastroesophageal reflux disorder, irritable bowel syndrome, neck pain, depression, allergic rhinitis, and headaches.   (Admin. R. 000664-67).   Primarily, Withers was found to have a borderline positive response but exhibited symptoms of autonomic dysfunction disorder; no surgery was planned or recommended, but an MRI confirmed cervical degenerative disc disease and lumbar degenerative disc disease.   (Admin. R. 000664-67).   Dr. Grentz noted that Withers reported tremors and hallucinations due to Parkinson's; she often had to "intentionally induce[] vomiting to provide relief" from the gastroparesis' bloating; Withers was a borderline type for diabetes and has poor treatment efficacy for her headaches.   (Admin. R. 000664-67).   The physical

15

examination was largely normal, though Dr. Grentz's report did note a tremor under the musculoskeletal section and ataxic gait under the neurological section.   (Admin. R. 000675).

On February 7, 2019, Withers visited Cumberland Gastroenterology and was seen by Nurse Sharon Adams ("Adams").   (Admin. R. 000555-56).   Adams examined Withers for complaints of abdominal pain, bloating, constipation, diarrhea, heartburn, and indigestion.   (Admin. R. 000556).   Adams explicitly noted that there were no tremors.   (Admin. R. 000556).   On February 18, 2019, Withers returned to Russell County Hospital for gastrointestinal imaging with contrast.   (Admin. R. 000614).   The results were entirely normal, and all ports of the gastrointestinal tract were normal in appearance.   (Admin. R. 000614).   On February 19, 2019, Withers met with Dr. Sambhu Choudhury ("Dr. Choudhury") regarding knee pain.   (Admin. R. 000559).   Dr. Choudhury did note that Withers' gait pattern was antalgic (abnormal), but there was "no evidence for sensory or motor deficits in the extremity.   Coordination appears full with no spasticity or rigidity.   Reflexes appear to be symmetric."   (Admin. R. 000561).

Finally, on February 25, 2019, Withers returned to Dr. Grentz for gastroesophageal reflux disorder, irritable bowel syndrome, and diabetes mellitus.   (Admin. R. 000679-91).   Examination at that time was largely normal, though Dr. Grentz did note a mild ataxia to Withers' gait, without tremors.   (Admin. R. 000686-88).

## C.   **Review of Reports**

In addition to the voluminous medical records, reports from these separate physicians are in the record.   The first report was a non-examining file review conducted by Dr. Wayne Gordon ("Dr. Gordon") on August 16, 2018.   (Admin. R. 000252-59).   Dr. Gordon noted the prior diagnoses of secondary Parkinson's tremors and headaches, and detailed the relevant medical

16

documentation.[2]   (Admin. R. 000252-54).   Dr. Gordon opined that "an impairing neurologic

diagnosis ha[d] not been established[,]" especially in light of his inability to confer with Dr. Zia.

(Admin. R. 000254).   However, Dr. Gordon commented that "[t]here [were] several diagnostic

studies without interpretation in the medical records including a tilt test and EMG."   (Admin. R.

000254).   By addendum, Dr. Gordon clarified his findings:

> Unfortunately interpretations of the EMG and til[t] test are not provided in the
> medical records which is highly unusual.   The nerve conduction study is
> completely normal.   The EMG study is poorly legible but also appears to be
> normal.
>
> I would need a formal interpretation of the tilt test but there does not appear to be
> any significant change in blood pressure or heart rate during the study with only
> complaints of lightheadedness.   I would defer a full interpretation of the study to a
> cardiologist.
>
> The normal limits of the EMG/NCV would not support a neurological diagnosis
> nor would the seemingly normal results of the tilt test.   As a result, these test results
> would not meet the diagnostic criteria for any diagnosis.

(Admin. R. 000255).   In a second addendum, Dr. Gordon reviewed additional records, but "[t]he

new information [did] not change [his] prior findings or conclusions."   (Admin. R. 000257).   The

tilt test was not positive for POTS, and while Withers may have secondary Parkinsonism, Dr.

Gordon opined that it did not constitute a significant degree of impairment.   (Admin. R. 000258).

Another report was prepared by Dr. Owen on February 8, 2019, from a physical

examination of Withers.   (Admin. R. 001134-40).   Dr. Owen recounted the diagnoses of

Parkinson's, autonomic nervous system disorder, migraines, and neck pain and reported tremors

as well as cognitive changes affecting memory and speech.   (Admin. R. 001134-35).   Dr. Owen

---

[2] Dr. Gordon unsuccessfully attempted to contact Dr. Zia on three separate occasions.   (Admin.
R. 000252).

also noted that Withers' head and hands were observed to have tremors on an intermittent basis. (Admin. R. 001134).   Dr. Owen's physical examination reflected that Withers' coordination was poor, her finger-nose-finger had a slight vibration but was accurate, mild cogwheeling on Withers' right side (though Dr. Owen commented that it "[c]ertainly [was] not as bad as [he] see[s] with Parkinson's disease"), a Babinski reflex indicating some degree of spasticity and upper motor neuron lesion, mild difficulty getting on and off the examination table, slightly spastic gait, and pain, all of which placed Withers in the moderate-to-severe impairment range.   (Admin. R. 001138).   Dr. Owen did not see any evidence for Parkinson's disease, but noted:   "She clearly is ongoingly disabled.   She is not able to return to the type of work performed prior.  . . . This lady clearly is suffering on a continuing basis."   (Admin. R. 001140).

The final report was from a non-examining file review by Dr. Jares ("Dr. Jares") dated March 19, 2019.   (Admin. R. 000584-88).   Dr. Jares summarized Withers' history of hypertension, thyroid dysfunction, high cholesterol, sleep apnea, gastroparesis, hiatal hernia, and tremors.   (Admin. R. 000584).   Dr. Jares noted diagnoses of possible parkinsonism, unspecified headaches, neck pain, and dizziness, but Dr. Jares did not believe these findings supported any specific restrictions or limitations on Withers' ability to return to work.   (Admin. R. 000586). Dr. Jares mentioned that "there is no indication of how [her] symptoms interfere with her daily activities."   (Admin. R. 000586).   Absent a specific diagnosis, Dr. Jares did not believe there was sufficient evidence to justify the restrictions and limitations indicated by Dr. Zia.   (Admin. R. 000587).   Dr. Jares concluded that the medical records did not support any of the following diagnoses: secondary Parkinsonism, ANS, possible multisystem atrophy, POTS, possible Arnold-Chiari malformation, degenerative cervical spine disease, bilateral occipital neuralgia, and cervical

sprain.   (Admin. R. 000587).   A subsequent review did not change Dr. Jares' conclusions. (Admin. R. 000588-91).

Withers' counsel objected to Dr. Jares' report, contending that "[p]hysical therapy has been recommended.   MRIs have occurred.   New diagnoses have been opined.   Physical examinations have documented objective findings related to her symptoms . . . ."   (Admin. R. 000548-50). Counsel continued:   "[i]t is clear that all opinions assert that [] Withers is suffering from symptoms in multiple areas of her body and additional treatment is absolutely necessary for diagnoses and assessment . . . ."   (Admin. R. 000548).   In conclusion, Withers' counsel insisted that "Dr. Jares' opinion regarding an absence of a 'clear cut neurologic diagnosis' . . . does not negate [] Withers' symptoms or ongoing treatment."   (Admin. R. 000550).

### D.   <u>Short-Term and Long-Term Disability Benefits</u>

According to the STD policy, a "disability" is defined as:

*Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred, as a result of which:

    a)    during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Job (on a part-time or full-time basis); and

    b)    after the Elimination Period, You are:

        1.    prevented from performing at least one of the Material Duties of Your Regular Job (on a part-time or fulltime basis); and

        2.    unable to generate Current Earnings which exceed 99% of Your Basic Weekly Earnings due to that same Injury or Sickness.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

(Admin. R. 000030).   The LTD definition of "disability" is largely identical but contains one additional key provision:

> After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean
> You are unable to perform all of the Material Duties of any Gainful Occupation.

(Admin. R. 000240).

Withers stated in support of her STD claim that she suffers from Parkinson's Disease and cerebellar herniation.  (Admin. R. 000475).  In Section 3, the attending physician's statement, Dr. Kilgallin detailed diagnoses of "secondary Parkinsonism, tremors, [and] headaches[,]" which result in symptoms of "pain, headaches, tingling/numbness, falling [and] tremors[.]"   (Admin. R. 000485).  Dr. Zia indicated that Withers had decreased motor activity due to cognitive decline. (Admin. R. 000485).  Withers' LTD claim did not mention these conditions and instead stated that she was unable to work due to "chronic pain, [inability] to get out of bed sometimes, constant changes in organ function due to [autonomic dysfunction syndrome.]"  (Admin. R. 001178).   The accompanying physician statement indicated a primary diagnosis of "tremors", but noting objective findings of degenerative disc disease, an abnormal brain scan, and autonomic dysfunction syndrome.  (Admin. R. 001190).  Other secondary conditions impacting Withers, according to Dr. Kilgallin, included syncope and collapse, headaches, chronic pain, and cervical disc degeneration.  (Admin. R. 001190).  Dr. Zia noted that Withers cannot work during a migraine headache, but "can work [with] intermittent time off for migraines."  (Admin. R. 001192).

Included in Withers' STD claim was a letter from the Human Resources department of Adanta—Withers' employer.  (Admin. R. 000479).  The letter stated that Adanta has "determined that [Withers'] condition is such that she cannot interact with her employees at a capacity which we feel is safe for her and those employees and clients."  (Admin. R. 000479).

As such, Adanta concluded that Withers "is unable to perform the essential functions as listed on her job description."   (Admin. R. 000479).

After Omaha's review of Withers' STD claim, the claim was approved for the period from January 4, 2018, to May 7, 2018.   (Admin. R. 000308).   Omaha's determination concluded:

> Your general examination revealed no documented abnormalities and your neurological examination revealed no motor atrophy, weakness, or tremors.   Your motor functions were symmetrical.   Your provider also noted the MRI of the cervical spine showed a whiplash injury with straight spine and loss of normal lordotic curve.   There were no other significant abnormalities noted and your thoracic spine scan was within normal limits.   The MRI of the brain demonstrated "very slight downward position of the cerebral tonsils, but otherwise normal MRI of the brain".   Provider noted that Dr. El-Naggar reviewed the scans as well and agreed with the treatment plan.
>
> . . . After his review, [Dr. Wayne Gordon] determined that your EMG study and nerve conduction studies were completely normal.   The tilt test results were not provided in the medical records to review.   A formal interpretation of the tilt test would need to be reviewed, but not provided.   There did not appear to be any significant change in blood pressure or heart rate during the study, only complaints of lightheadedness.   The normal limit results of your EMG and the nerve conduction study would not support a neurological diagnosis and these test results would not meet the diagnostic criteria for any diagnosis.   Based on our review, the medical records do not support your inability to perform at least one of the material duties of your regular job after May 07, 2018.

(Admin. R. 000308-09).   On this basis, Withers' STD benefits claim was denied.   (Admin. R. 000309).   On appeal, Omaha noted that only one new piece of information provided:   "a 09/07/18 letter from Dr. Zia to simply state that [] [Withers] had been diagnosed with Parkinson's Disease", but this was insufficient to approve benefits.   (Admin. R. 000052).

Regarding the LTD claim, Omaha noted that Withers "stopped working on January 4, 2018, and [the] first date of treatment was not until February 21, 2018."   (Admin. R. 001171).   Like the STD determination, Omaha indicated that numerous test results were normal and did not highlight any conditions that would prohibit Withers from returning to her position at Adanta.

21

(Admin. R. 001171-72).   Omaha's reviewing physician, Dr. Gordon, unsuccessfully attempted to contact Dr. Zia "to discuss [Withers'] current restrictions and limitations . . . ."   (Admin. R. 001172).   Dr. Zia's statement that Withers could intermittently work provided she did not have a migraine reflected "no evidence of significant change in [her] medical or functional status." (Admin. R. 001172).   On appeal, the denial of the LTD claim was upheld utilizing Dr. Jares' file review, from which Omaha discerned:

> There are findings of tremors, reduced arm swing and rigidity, but no other parkinsonian features.   There is no report of a positive response to Premipexole [*sic*].   There is no objective evidence of autonomic dysfunction.   The claimant has mild cervical spine degenerative changes noted on a cervical MRI but their significance is unknown.

(Admin. R. 000542 (quoting Admin. R. 000584-91)).   Dr. Owen's physical examination did not affect Dr. Jares' opinion.   (Admin. R. 000543).   Ultimately Omaha concluded "the medical documentation [did] not provide medical findings to support physical or cognitive restrictions and limitations that would preclude [] [Withers] from performing her occupation."   (Admin. R. 000543).

In denying Withers' STD claim, Omaha did not explain why Dr. Gordon's determination merited more weight than Dr. Zia's.   (Admin. R. 000306-09).   The same preference of Dr. Gordon's opinion over Dr. Zia's prevailed in the STD appeal, the LTD denial, and the LTD appeal. (Admin. R. 000053-57, 1169-72, 540-43).

Turning to whether Omaha's determination was proper, a primary contention between the parties is the reliability of non-examining file reviewers, like Drs. Gordon and Jares, in contrast to the examining medical documentation and reports by examining sources.   As the Sixth Circuit has noted:

> [W]hile we find that [the plan administrator]'s reliance on a file review does not, standing alone, require the conclusion that [the plan administrator] acted improperly, we find that the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).   In the present case, Omaha explicitly retained the right to conduct in-person examinations of Withers:

> We may occasionally require You to be examined by a Physician or vocational rehabilitation expert of Our choice to assist in determining whether benefits are payable.   We will pay for these examinations; however, You may be responsible for fees associated with failure to notify the examination office of Your appointment cancellation within the required amount of time specified by the examiner.   We may recover this fee by reduction of benefits that are payable.   We will not require more than a reasonable number of examinations.

(Admin. R. 000025 (STD Benefits); Admin. R. 000235 (LTD Benefits)).   The decision not to utilize a physical examination and instead rely on file reviews is "just one more factor to consider in [the] overall assessment" of Omaha's determination.   *Calvert*, 409 F.3d at 295.   However, as one court noted in upholding the reversal of the administrator's denial of the employee's claims, "[t]he evidence presented in the administrative record did not support the denial of benefits when only [the plan administrator]'s physicians, who had not examined [the plaintiff], disagreed with the treating physicians."   *Hoover*, 290 F.3d at 809.

An additional consideration in this matter is Omaha's dual role of determining whether Withers qualifies for STD and LTD benefits and paying the benefits if Withers is eligible.   These roles create a conflict of interest when determining Withers' eligibility which the Supreme Court has recognized as a factor when determining whether a plan administrator has abused its discretion.   *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-17 (2008).   While this Court is conducting a *de*

*novo* review, Omaha's dual role is considered in evaluating whether it made the correct decision. *Id.*; *see also Hoover*, 290 F.3d at 808-09 (citing *Perry*, 900 F.2d at 966-67).

Further, when reviewing the medical documentation submitted during the claims process, "a plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physicians." *Calvert*, 409 F.3d at 294 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). Instead, the plan administrator must, at a minimum, "give reasons for adopting an alternative opinion." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006) ("Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." (citation omitted)).

In this instance, Withers has been diagnosed with Parkinson's disease, which is supported by the repeated complaints and documented observations of tremors, hyperreflexia, bradykinesia, abnormal gait, and decreased arm swing. (Admin. R. 000191, 195, 290, 293, 300, 675, 827, 832, 836, 1013, 1086, 1118, 1120). Withers' headaches are also substantiated, necessitating ganglion blocks to alleviate the pain. (Admin. R. 001082-85, 1090). Finally, degenerative disc disease (cervical and lumbar) have been confirmed by MRI review. (Admin. R. 000664-67). Plausible diagnoses that may be present, but may have not been fully confirmed (or ruled out), include an Arnold-Chiari malformation 1, hyperhidrosis, gastroparesis, hypertension, Meniere's disease, Hashimoto's disease/thyroiditis, and hyperlipidemia.

While Adanta has stated that Withers is unable to complete the essential functions of her job, the Court will still evaluate Withers' position, the restrictions imposed by her condition(s), and whether Withers may actually have the ability to return to her work. (Admin. R. 000479);

*see Javery*, 741 F.3d at 701 ("[W]e first look[] to the nature of Plaintiff's job.  . . . We next look[] at the medical evidence, and appl[y] it to the occupational standard.").  Withers' job description describes the essential duties as "[p]rovid[ing] oversight to the individualized Placement and Supports (IPS) for supported employment[;] [e]nsur[ing] good program outcomes by providing training, supervision and field mentoring for staff, monitoring outcomes, and implementing quality improvement plans[;] . . . [and] act[ing] as a liaison to other departments and agencies."  (Admin. R. 000480).   The description also noted the different agency policies and regulations, manuals, handbooks, and employment documents noted that Withers must utilize in her work.   (Admin. R. 000480).   Additional duties for the position include:   hiring, training, and evaluating employment specialists; developing expectations for specialists regarding community time, employer contacts, and employment rate; assigning each employment specialist to mental health teams, and to attend each mental health treatment team at least quarterly to enhance integrated services; conduct quarterly group supervision; provide program supervision, including some office-based sessions and field mentoring; collect and process client outcomes on a month's basis and set team goals for improvement; and regularly communicate with team leaders to improve efficiency.   (Admin. R. 000481).   The physical requirements of the position are walking, standing, sitting, and driving on a regular basis, as well as occasional bending, lying, and kneeling.   (Admin. R. 000483).   Further, mental requirements of the position require high-level planning, adapting, application, and modification.   (Admin. R. 000480-81).

Neither Dr. Gordon nor Dr. Jares considered any of the requirements of Withers' job with Adanta, mental or physical.   (Admin. R. 000252-59, 584-91).   Dr. Jares' original review of Withers' file was incomplete, as Omaha did not provide him with the full medical record, which

led to Withers' objections.   (Admin. R. 000566-67).   Though Dr. Owen does not directly discuss
Withers' occupation, he does indicate that "[s]he clearly is ongoingly disabled.   She is not able to
return to the type of work performed prior", which indicates some familiarity with the nature of
her work.   (Admin. R. 001140).   Even in Omaha's denials, it never addressed the requirements
of Withers' position or explain how Withers would be able to continue working.   (Admin. R.
000053-57, 306-09, 540-43, 1169-72).   When an administrator crafts a determination that
contains no discussion of a claimant's occupational duties and their ability, or inability, to perform
those duties, then the administrator's decision was not a "*reasoned* denial".   *Elliott*, 473 F.3d at
619.

When reviewing the evidence present in the administrative record, Withers' degenerative
disc disease, Parkinson's disease, headaches, Meniere's disease, and dizziness clearly would
prevent Withers from walking and standing on a regular basis.   Dr. Owen's examination explicitly
noted Withers having difficulties moving on and off of the examination table, as well as walking
out the door.   (Admin. R. 001138).   Further, Withers' conditions have affected her gait, resulted
in slowness of movement (bradykinesia), and has caused overactive reflexes and twitching
(hyperreflexia).[3]   (Admin. R. 000191-95, 290-93, 300, 675, 827-36, 1013, 1086, 1118).

---

[3] Dr. Zia's comment that Withers "can work [with] intermittent time off for migraines" is puzzling
in light of other findings contained in his treatment notes.   (Admin. R. 001133).   This notation
was made on August 3, 2018, which was after the multiple documented observations of tremors,
bradykinesia, hyperreflexia, and potential Arnold-Chiari malformation.   (Admin. R. 001133;
Admin. R. 191, 195, 290, 293, 300, 675, 827, 832, 836, 1013, 1086, 1118).   The medical evidence
indicates that Withers may be suffering from several conditions which, cumulatively, would
prevent Withers from wholly performing the essential duties, but Dr. Zia does not explain this
conflict.

As for the mental requirements of Withers' position, Dr. Zia's noted "decreased motor activity" and "cognitive decline". (Admin. R. 000486).   Dr. Owen's report indicates that "she did have definitely positive Hoffman's and Babinski's indicating some degree of spasticity and upper motor neuron lesion."   (Admin. R. 001138).   There was no explanation, however, as to how this finding would impact her mental functioning

Finally, it is significant that Omaha initially had granted Withers' STD benefits claim for the period from January 4, 2018, to May 7, 2018, stating that Withers had a diagnosis of secondary Parkinson's tremors.   (Admin. R. 000308).   But Omaha did not detail any improvement in Withers' condition from May 8, 2018, and onward.   Instead, as discussed more thoroughly above, Omaha relied upon Dr. Gordon's interpretation of the EMG to ultimately deny Withers' STD claim beyond May 8, 2018.   There is nothing in the record demonstrating that Withers' condition improved after May 8, 2018.   Instead, the record reflects that her conditions either remained at the same level or worsened beyond that date.

In *Javery*, the Sixth Circuit summarized the plaintiff's evidence in affirming the trial court's reversal of the plan administrator's decision:

> Plaintiff submitted medical evidence from numerous doctors and therapists who directly treated or examined him and concluded that he was unable to work due to a combination of his physical and mental conditions.   He visited over a dozen medical experts.   Those doctors who knew him best concluded, unequivocally, that he was unable to work at the relevant time.   Defendant offers little to contradict this evidence.

*Javery*, 741 F.3d at 702.   Like the plaintiff in *Javery*, the evidence supporting Withers' claims for STD and LTD benefits is substantial.   The fact that Omaha did not avail itself of its right to independently examine Withers, the unexplained reliance by Omaha on the reports by Drs. Gordon and Jares over the medical information from Dr. Zia and Dr. Owen, who respectively treated and

27

examined Withers, the lack of analysis regarding Withers' occupation in the denial claims and in

the file review reports, as well as the observations and notations by treating and examining medical

providers, the requirements of Withers' position, and Omaha's initial approval of STD benefits

from January 4, 2018, to May 7, 2018, the Court concludes that Withers was unable to perform

the essential duties of her occupation during the relevant periods of Withers' STD and LTD claims.

As such, Omaha's determination to deny Withers' STD and LTD benefits claims was improper.

### E.    <u>Social Security Determination</u>

"A determination that a person meets the Social Security Administration's uniform

standards for disability benefits does not make her automatically entitled to benefits under an

ERISA plan, since the plan's disability criteria may differ from the Social Security

Administration's.   Nonetheless, the Social Security Administration's decision 'is far from

meaningless.'"   *DeLisle v. Sun Life Assurance Co.*, 558 F.3d 440, 445-46 (6th Cir. 2009) (internal

citation omitted) (citation omitted)).   Attached to Withers' motion was the determination by

Administrative Law Judge Boyce Crocker ("ALJ") that Withers had been disabled since January

4, 2018.   (Soc. Sec. Op. 3, DN 13-2).

The Social Security Administration has promulgated regulations setting forth a five-step

sequential evaluation process for evaluating a disability claim.   *See* "Evaluation of disability in

general," 20 C.F.R. §§ 404.1520, 416.920.   In summary, the evaluation proceeds as follows:

1)    Is the claimant engaged in substantial gainful activity?

2)    Does the claimant have a medically determinable impairment or combination
of impairments that satisfies the duration requirement and significantly limits
his or her ability to do basic work activities?

3)    Does the claimant have an impairment that meets or medically equals the
criteria of a listed impairment within Appendix 1?

4)   Does the claimant have the residual functional capacity to return to his or her past relevant work?

5)   Does the claimant's residual functional capacity, age, education, and past work experience allow him or her to perform a significant number of jobs in the national economy?

The ALJ granted Withers' claim at the fifth step, explicitly finding:   "Considering [] [Withers'] age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that [] [Withers] can perform . . . ."   (Soc. Sec. Op. 3).   This lack of positions was based on the Dictionary of Occupational Titles—the same source considered by Omaha during the LTD appeal analysis.   *Compare* (Admin. R. 000540), *with* (Soc. Sec. Op. 5, DN).

Further, the ALJ said Withers has the following severe impairments: Parkinsonism/Tremors, rule out; Ehlers-Danlos syndrome, rule out; Degenerative Disc Disease of the cervical spine; Neuralgia; Interstitial Cystitis; Postural Orthostatic Tachycardia Syndrome (POTS); and Gastroparesis.   (Soc. Sec. Op. 1).   While Withers did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ opined that Withers has the residual functional capacity to perform sedentary work with the following restrictions:   Withers can stand or walk two out of eight hours inconsistently; occasionally climb ramps and stairs; cannot climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; can frequently handle and finger with the right upper extremity; can frequently reach overhead, in front, and laterally with bilateral upper extremities; and avoid all exposure to unprotected heights and moving machinery; Withers must elevate her lower extremities two feet off the deck every

29

two hours for ten minutes per day and would need an accommodation; and Withers must be off task for 15% of the day.   (Soc. Sec. Op. 2).   Finally, the ALJ unequivocally stated Withers "has past relevant work as a Work Development Specialist, Residence Supervisor, and Director of Employee Services.   The demands of [] [Withers'] past relevant work exceed the residual functional capacity."   (Soc. Sec. Op. 3).

As recognized above, the finding by the Social Security Administration that Withers cannot perform her past relevant work or any position that exists in significant numbers, is not dispositive to whether Withers is disabled pursuant to Omaha's plans but is certainly consistent with the Court's determination regarding the STD and LTD claims.   The finding that Withers was disabled as of January 4, 2018—the same date Withers asserted to Omaha that she was disabled—reaffirms the Court's conclusion.

**F.    Remedy**

When reviewing the present facts, examinations, and analysis in light of a *de novo* standard, and according no deference or presumption of correctness to Omaha's determination, the undersigned concludes that Omaha's denial of Wither's claims was unsubstantiated.   "In ERISA cases, courts possess considerable discretion in choosing whether to remand the case to the administrator to re-evaluate the claimant's case or to award the benefits outright."   *Bailey v. United of Omaha Life Ins. Co.*, 938 F. Supp. 2d 736, 749 (W.D. Tenn. 2013) (citing *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 339 (6th Cir. 2009)).   In lieu of remand, a court can award benefits outright without remand if the administrator denied benefits to which the plaintiff "was clearly entitled."   *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426

F.3d 20, 31 (1st Cir. 2005)).   Because Withers was clearly entitled to the STD and LTD benefits, the Court will award benefits outright.

### V.   <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment (DN 13) is **GRANTED**.   Short-term disability benefits shall be back-paid from May 8, 2018, through the exhaustion of the policy on July 4, 2018.   Long-term disability benefits shall be back-paid for the twenty-four month period of July 5, 2018, to July 5, 2020.[4]

This matter shall be remanded for Defendant to determine whether Plaintiff remains eligible for long-term disability benefits after July 5, 2020.

Finally, any motions for attorneys' fees and costs must be filed within the deadlines required by the Fed. R. Civ. P. 54(d)(2) and LR 54.4.

Greg N. Stivers, Chief Judge
United States District Court

March 18, 2021

cc:    counsel of record

---

[4] The twenty-four-month review period is consistent with the Social Security Administration's period for "continuing disability review" and the LTD policy.   (Soc. Sec. Op. 6; Admin. R. 000240).